In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 17-2428

PLANNED PARENTHOOD OF INDIANA
AND KENTUCKY, INC.,

*Plaintiff-Appellee,*

*v.*

KRISTINA BOX, Commissioner,
Indiana State Department of Health, *et al.*,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-01636-SEB-DML — **Sarah Evans Barker**, *Judge*.

_____

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

DECIDED MARCH 12, 2021

_____

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal returns to us on re-
mand from the Supreme Court of the United States. In 2019,
we affirmed the district court's grant of a preliminary injunc-
tion against enforcement of a new Indiana statutory re-
striction on minors' access to abortions. See *Planned*

*Parenthood of Indiana & Kentucky, Inc. v. Adams*, 258 F. Supp. 3d 929 (S.D. Ind. 2017), *aff'd*, 937 F.3d 973 (7th Cir. 2019), *reh'g denied*, 949 F.3d 997 (7th Cir. 2019). The State defendants petitioned for a writ of certiorari. The Supreme Court granted the petition, vacated our decision, and remanded for further consideration in light of *June Medical Services LLC v. Russo*, 140 S. Ct. 2103 (2020), which struck down a Louisiana law regulating abortion providers, but without a single majority opinion.

We apply the predominant and most sound approach to the "narrowest ground" rule in *Marks v. United States*, 430 U.S. 188 (1977), for assessing the precedential force of Supreme Court decisions issued without a majority opinion. The opinions in *June Medical* show that constitutional standards for state regulations affecting a woman's right to choose to terminate a pregnancy are not stable, but they have not been changed, at least not yet, in a way that would change the outcome here.

The Chief Justice's concurring opinion in *June Medical* offered the narrowest basis for the judgment in that case, giving stare decisis effect to *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), on the essentially identical facts in *June Medical*. The *Marks* rule does not, however, turn everything the concurrence said—including its stated reasons for disagreeing with portions of the plurality opinion—into binding precedent that effectively overruled *Whole Woman's Health*. That is not how *Marks* works. It does not allow dicta in a non-majority opinion to overrule an otherwise binding precedent. We applied those binding standards from *Whole Woman's Health* in our earlier decision, and that decision has not been overruled by a majority decision of the Supreme Court. We therefore again affirm the district court's preliminary injunction

barring enforcement of the challenged law pending full review in the district court.

I.   *Factual and Procedural Background*

Given the lengthy opinions already issued in this case, we summarize the issues leading up to this point. Indiana's Senate Enrolled Act 404, enacted in 2017, included amendments to Indiana's judicial-bypass process. That process, required by *Bellotti v. Baird*, 443 U.S. 622 (1979), creates a narrow legal path for an unemancipated minor to obtain an abortion without parental consent. The minor must first find her way to a state trial court. She must then obtain a court order finding either that the abortion would be in her best interests or that she is sufficiently mature to make her own decision. Ind. Code § 16-34-2-4(e). Senate Enrolled Act 404 amended the process in several ways, some of which the district court preliminarily enjoined. Only one amendment is at issue in this appeal: a new requirement that a minor's parents be notified that she is seeking an abortion through the bypass procedure—unless the judge finds that such parental notice, as distinct from requiring parental consent, is not in the minor's best interests. Ind. Code § 16-34-2-4(d). Maturity does not affect the new notice requirement.

To support its motion for preliminary injunction, plaintiff offered evidence on the likely effects of the new notice requirement. The evidence took the form of affidavits from seven witnesses familiar with the actual workings of the judicial bypass process and the situations of and stresses upon minors seeking abortions or advice on abortions. The State defendants chose not to offer evidence at that stage of the case. They also did not challenge the reliability or credibility of plaintiff's evidence.

The district court issued detailed findings of fact and conclusions of law finding that the new notice requirement was likely to impose an undue burden on the right to obtain an abortion for a significant fraction of minors for whom the requirement would be relevant. 258 F. Supp. 3d 929, 939–40. We affirmed, emphasizing the lopsided evidence showing both the likely burden and the absence of appreciable benefit from the new notice requirement. 937 F.3d at 989–90. We relied heavily on *Whole Woman's Health*, guided by its application of the "undue burden" standard adopted in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). We also relied on *Whole Woman's Health*'s approval of a pre-enforcement injunction against challenged laws likely to impose an undue burden. 937 F.3d at 979–80.

In *Whole Woman's Health*, the Supreme Court affirmed a district court decision striking down a so-called admitting privileges requirement. The challenged Texas law required a physician who performed an abortion to have admitting privileges at a hospital within thirty miles of the abortion site. The Supreme Court based its decision on detailed factual findings showing both the burdens imposed by that requirement and the lack of accompanying benefits. 136 S. Ct. at 2310–14.

In *June Medical* in 2020, the Court held unconstitutional a Louisiana admitting-privileges law that tracked nearly word-for-word the Texas law struck down in *Whole Woman's Health*. A plurality of four Justices examined the detailed evidence and findings on the likely burdens and benefits of the Louisiana admitting privileges law, and, following the reasoning and holding of *Whole Woman's Health*, the plurality voted to strike down the new law. 140 S. Ct. at 2122–32 (plurality opinion of Breyer, J.). Four Justices dissented in four opinions.

Chief Justice Roberts also voted to strike down the Louisiana law, concurring in the judgment in a separate opinion that is the focus here on remand. He had dissented in *Whole Woman's Health*. He wrote that he still disagreed with that decision, but he explained that principles of stare decisis called for the Court to adhere to that earlier result on the essentially identical facts. 140 S. Ct. at 2134, 2139 (Roberts, C.J., concurring in judgment). He then explained that he believed *Whole Woman's Health* had erred by balancing the challenged law's benefits against its burdens in evaluating its constitutionality. *Id.* at 2135–36. Both the plurality and the Chief Justice agreed, however, that enforcement of the Louisiana law was properly enjoined before it took effect.

Shortly after issuing *June Medical*, the Court issued its order in this case granting the State defendants' petition for a writ of certiorari, vacating our decision, and remanding for further consideration in light of *June Medical*. See *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 141 S. Ct. 187, 188 (2020). Such a "GVR" order calls for further thought but does not necessarily imply that the lower court's previous result should be changed. *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019). Pursuant to Circuit Rule 54, the parties submitted their views on the remand.[1]

---

[1] The State defendants at the same time petitioned for immediate en banc consideration of this case. No member of this court has requested an answer to or a vote on that petition. This decision on remand is being issued by the panel that heard this appeal originally. The pending petition is denied.

II. *Marks v. United States and Narrow Opinions*

   A. *Marks and its Variations*

The remand poses questions about how to interpret and apply decisions by the Supreme Court issued without majority opinions. The Supreme Court's leading guidance on the question is one sentence in *Marks*: "When a fragmented court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" 430 U.S. at 193, quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.). In recent decades, plurality decisions have become more frequent, especially on some of the most controversial issues the federal courts face. Lower courts have tried to follow the *Marks* instruction in a variety of scenarios, and scholars and lower courts have identified several distinct models for applying *Marks*.

   A helpful guide comes from Professor Ryan Sullivan:

> The first of these approaches interprets *Marks* as limited to a narrow subset of plurality decisions reflecting a clearly discernible "implicit consensus" or "common denominator" among the Justices. The second approach understands *Marks* as an instruction to lower courts to identify the opinion in a plurality decision that reflects the judgment-critical vote—typically the fifth concurring vote—and treat that opinion as the Court's holding. The third and final approach looks for points of majority consensus among

> different factions of concurring and dissenting
> Justices on distinct legal issues raised by the
> plurality decision.

Ryan Williams, *Questioning Marks: Plurality Decisions and Precedential Constraints*, 69 Stan. L. Rev. 795, 806–07 (2017).

The parties' positions here identify different approaches and set the stage for our consideration. Relying on the first model, which is predominant in precedent, plaintiff Planned Parenthood contends that the *June Medical* plurality and concurrence share the narrow, common ground that *Whole Woman's Health* has stare decisis effect on essentially identical facts. Because that is all that they share, that is the holding of *June Medical*, which thus did not produce a majority to overrule *Whole Woman's Health*. Not having been overruled, the standards and principles of *Whole Woman's Health* still govern here.

The State invokes both the second and third models for applying *Marks*. Using the second model, the State says the *June Medical* concurrence provided the swing vote and the narrowest ground for the judgment—stare decisis for *Whole Woman's Health* on identical facts. That much is clear. The State goes further, however, in asserting in effect that every word of the concurrence must therefore be treated as the binding, precedential holding of *June Medical*, whether those additional portions support the judgment or not. Under that approach, we would give the concurrence the effect of overruling *Whole Woman's Health* except as to virtually identical facts. Invoking the third model, using all opinions to predict votes in a future case, the State also argues that the *June Medical* concurrence and the dissents agreed on enough common ground to predict reliably that a majority of the Court would overrule

*Whole Woman's Health* and strike down the Indiana statute challenged here.

We first identify questions in applying *Marks* and then address the variations argued by the parties, albeit in a different order. We close by addressing a couple of additional arguments raised in the briefs. The Supreme Court has observed that the *Marks* rule is "more easily stated than applied" and that it has "baffled and divided" lower courts. *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003), quoting *Nichols v. United States*, 511 U.S. 738, 745–46 (1994). We hope here to avoid adding evidence to support the "baffled" observation.

To identify a few of the problems baked into the *Marks* rule, how do we measure narrow v. broad? Does *Marks* require common ground among opinions, and what if there is none? What counts as a common ground? Is it simply the existence of a shared outcome or does it require a shared approach to resolving a given legal question? Is everything in the narrowest opinion controlling, or just the portion supporting the judgment? Can a "narrow" non-majority opinion overrule a previously controlling precedent? Do dissenting opinions count at all in measuring precedential effect?

B. *Dissenting Opinions and the Prediction Model of Precedent*

The last question, about dissenting opinions, is the easiest to answer, at least for a lower court like this one. The answer resolves the State's reliance on the third model, counting votes among all opinions. Dissenting opinions do not count in the *Marks* assessment. *Marks* itself wrote in terms of "those Members who concurred in the judgments" 430 U.S. at 193,

quoting *Gregg,* 428 U.S. at 169 n.15. The weight of circuit and-scholarly authority has taken the Court's instruction at face value.

We have rejected using dissents in *Marks* assessments: "under *Marks*, the positions of those Justices who *dissented* from the judgment are not counted in trying to discern a governing holding from divided opinions." *Gibson v. American Cyanamid Co.*, 760 F.3d 600, 620 (7th Cir. 2014); accord, e.g., *United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009) (stating that *Marks* applies to opinions of those "Members who concurred in the judgment[]" of the Court); *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 280 n.13 (4th Cir. 2019) (en banc) (same); *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (same); *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) (same); *Rappa v. New Castle County*, 18 F.3d 1043, 1057 (3d Cir. 1994) (same); *United States v. Hughes*, 849 F.3d 1008, 1012 (11th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 1765 (2018) ("When determining which opinion controls, we do not 'consider the positions of those who dissented.'"), quoting *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007); *United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013) ("Stated differently, *Marks* applies when, for example, 'the *concurrence* posits a narrow test to which the *plurality* must necessarily agree as a logical consequence of its own, broader position.'") (emphasis added and removed), quoting *King v. Palmer*, 950 F.2d 771, 782 (D.C. Cir. 1991) (en banc); *King*, 950 F.2d at 783 ("[W]e do not think we are free to combine a dissent with a concurrence to form a *Marks* majority."); cf. *United States v. Davis*, 825 F.3d 1014, 1025 (9th Cir. 2016) (en banc) ("[W]e assume but do not decide that

dissenting opinions may be considered in a *Marks* analysis.");[2] *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006) ("[W]e do not share the reservations of the D.C. Circuit about combining a dissent with a concurrence to find the ground of decision embraced by a majority of the Justices.").

Scholars have generally agreed that dissenting opinions do not actually count, while noting that courts are not entirely consistent on this score. Michael L. Eber, *When the Dissent Creates the Law: Cross-Cutting Majorities and the Prediction Model of Precedent*, 58 Emory L.J. 207, 218 (2008); Maxwell L. Stearns, *The Case for Including Marks v. United States in the Canon of Constitutional Law*, 17 Const. Comment. 321, 328 (2000); Nina Varsava, *The Role of Dissents in the Formation of Precedent*, 14 Duke J. of Const. Law & Public Policy 285, 298–99 (2019); Jonathan H. Adler, *Once More, with Feeling: Reaffirming the Limits of Clean Water Act Jurisdiction*, in The Supreme Court and the Clean Water Act: Five Essays 81, 93–94 (L. Kinvin Wroth ed., Vt. Law Sch. 2007).[3]

---

[2] The *Davis* en banc majority did not decide this question, but concurring and dissenting opinions disagreed on it. See 825 F.3d at 1029 (Christen, J., concurring) (*Marks* limits review to the opinions of Justices who concurred in judgment); *id.* at 1031 (Bea, J., dissenting) (*Marks* permits counting votes, including from dissenting Justices).

[3] To be sure, some of these scholars have urged a different approach, arguing that lower courts *should* use a prediction model, taking dissenting opinions into account to predict how the Supreme Court will decide the next case, but they agree that the prediction model is rarely used by courts and even more rarely acknowledged. See, e.g., Evan H. Caminker, *Precedent and Prediction: The Forward Looking Aspects of Inferior Court Decisionmaking*, 73 Tex. L. Rev. 1, 74 (1994) (arguing that "prediction has a proper, albeit circumscribed, role to play in inferior court decisionmaking," but "conced[ing] that others will disagree with this conclusion");

This aversion to dissenting opinions in applying *Marks* is consistent with our more general approach to Supreme Court precedent. We simply do not survey non-majority opinions to count likely votes and boldly anticipate overruling of Supreme Court precedents. That is not our job. As we are frequently reminded, only the Supreme Court itself can overrule its own decisions. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); accord, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("it is this Court's prerogative alone to overrule one of its precedents"); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (instructing courts of appeals to leave to the Supreme Court "the prerogative of overruling its own decisions"), citing *Rodriguez de Quijas*, 490 U.S. at 484; *Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014, 1019 (7th Cir. 2002) (highlighting that in *State Oil v. Khan*, the Supreme Court "pointedly noted" that the Seventh Circuit had been correct in refusing to declare defunct the Court's directly controlling precedent). Accordingly, we decline the State's invitation here to add together the Chief Justice's concurrence and the dissenting opinions and declare *Whole Woman's Health* overruled.[4]

---

Eber, *When the Dissent Creates the Law*, 58 Emory L. J. at 232 (acknowledging that "most judges do not endorse the prediction model of precedent, at least openly") (footnotes omitted); Varsava, *The Role of Dissents*, 14 Duke J. of Const. Law & Public Policy at 321–22 ("Advocates of the predictive approach generally exclude dissenting opinions from the process, but the inclusion of dissents is a theoretical possibility.") (footnotes omitted).

[4] We recognize that parties may decide to adopt the prediction model in making decisions about their conduct or in deciding how to litigate disputes. The prediction model has a distinguished pedigree: "The prophecies of what the courts will do in fact, and nothing more pretentious, are what I mean by the law." Oliver Wendell Holmes, *The Path of the Law*, 10

C.  *Logical Subsets and Nesting Dolls*

We turn now to the first model of the *Marks* rule, argued by plaintiff and consistent with the substantial weight of authority: look for a "narrowest ground" that is a logical subset of the reasoning in other opinions concurring in the judgment. The *Marks* rule is easiest to apply when the fifth vote comes in a concurrence that agrees with part of the plurality's reasoning, so that the narrower opinion may be described as adopting a logical subset of a broader opinion's reasoning. The often-cited metaphor is Russian nesting dolls. We and other courts have often said that for the *Marks* rule to apply, there must be a genuine common denominator underlying the reasoning of a majority of justices. E.g., *Gibson*, 760 F.3d at 619; *Heron*, 564 F.3d at 884; *Rappa*, 18 F.3d at 1058; *King*, 950 F.2d at 781. That opinion—the narrowest one—"must represent a common denominator of the Court's *reasoning*; it must embody a position implicitly approved by at least five Justices who support the judgment." *King*, 950 F.2d at 781 (emphasis added).

Under this approach, when the reasoning underlying the decisive concurring opinion fails to fit within a broader logical circle drawn by the other opinions, *Marks* simply does not apply. *King*, 950 F.2d at 782; accord, *Alcan Aluminum Corp.*, 315 F.3d at 189 (explaining that where no single standard "constitutes the narrowest ground for a decision on that issue, there is then no law of the land").

---

Harv. L. Rev. 457, 461 (1897). But in a hierarchical court system, lower courts do not arrogate to themselves the task of overruling precedents of higher courts.

In the simplest scenario, four Justices agree on two grounds for the judgment, and the decisive vote is cast by a concurring Justice who agrees with only one of those. In such a case, the concurring opinion's rationale provides the narrowest ground and is deemed controlling.

If we were to depart from this predominant understanding of *Marks* and applied it in the absence of a common denominator, then a single approach to a given legal question lacking majority support, perhaps lacking support from more than one Justice, would become national law. See *King*, 950 F.2d at 782. This would be true even if that single approach produced the critical fifth vote supporting the judgment of the Court. *Id.*; see also *Gaylor v. Mnuchin*, 919 F.3d 420, 433 n.9 (7th Cir. 2019) (stating that where one Justice's concurring opinion reached the same result as the plurality opinion, but did so under a different constitutional clause, that concurring opinion was not a "logical subset" of the plurality opinion), quoting *Gibson*, 760 F.3d at 619; *Heron*, 564 F.3d at 884 ("When, however, a concurrence that provides the fifth vote necessary to reach a majority does not provide a 'common denominator' for the judgment, the *Marks* rule does not help to resolve the ultimate question."). If there is no common denominator, then there is no binding reasoning, just facts and a result.

The Supreme Court itself appears to follow this approach. In *King*, the District of Columbia Circuit illustrated this point with *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), where a plurality of four Justices wrote that evidence could be seized pursuant to the plain-view exception to the Fourth Amendment's warrant requirement only when the evidence was discovered inadvertently. See *King*, 950 F.2d at 782. Four other Justices wrote that inadvertence was not necessary for a valid

seizure of evidence in plain view. *Coolidge*, 403 U.S. at 492, 506, 510, 516 (four opinions, each concurring in part and dissenting in part). Justice Harlan concurred in the judgment that the challenged search was unconstitutional, but he offered no rationale for evaluating the inadvertence requirement laid out by the plurality. *Id.* at 490 (Harlan, J., concurring in judgment).

In a later decision, *Texas v. Brown*, 460 U.S. 730 (1983), the Supreme Court said that the *Coolidge* plurality's inadvertence requirement did not constitute binding precedent and should be understood only as "the considered opinion of four Members of this Court." *Brown*, 460 U.S. at 737 (plurality opinion). Eventually, the Supreme Court rejected the inadvertence requirement altogether. *King*, 952 F.2d at 782, citing *Horton v. California*, 496 U.S. 128 (1990).

In similar circumstances—where no opinion adopting a narrowest common denominator of the Court's reasoning can be identified—this court and other circuits have explicitly declined to apply *Marks*. See, e.g., *Gibson*, 760 F.3d at 619–20 (declining to apply *Marks* to *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998)); *Heron*, 564 F.3d at 884 (declining to apply *Marks* to *Missouri v. Seibert*, 542 U.S. 600 (2004)); *Schindler v. Clerk of Circuit Court*, 715 F.2d 341, 345 (7th Cir. 1983) (declining to apply *Marks* to *Baldasar v. Illinois*, 446 U.S. 222 (1980)); *Davis*, 825 F.3d at 1021–22 (declining to apply *Marks* to *Freeman v. United States*, 564 U.S. 522 (2011));[5] *Alcan Aluminum Corp.*, 315

---

[5] In *Hughes v. United States*, the Supreme Court explained that in *Freeman*, "[n]o single interpretation or rationale commanded a majority" of Justices. 138 S. Ct. 1765, 1768 (2018). The Court acknowledged that some courts of appeals, including the Seventh Circuit, in applying *Marks* had adopted the reasoning of Justice Sotomayor's solo opinion concurring in the judgment. *Id.* Other

F.3d at 189 (declining to apply *Marks* to *Eastern Enterprises*); *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 237 (4th Cir. 2002) (also declining to apply *Marks* to *Eastern Enterprises*).

In other words, *Marks* does not command lower courts to find a common denominator—to find an implicit consensus among divergent approaches—where there is actually none. Cf. *Grutter*, 539 U.S. at 325 (discussing division among federal courts of appeals in applying *Marks* to *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978)); *Nichols*, 511 U.S. at 745 (discussing division among state and federal courts in applying *Marks* to *Baldasar*). It is not our duty or function to bring symmetry to any "doctrinal disarray" we might encounter in our application of Supreme Court precedent.[6]

---

courts, however, also applying *Marks*, adopted the plurality's reasoning. *Id. Hughes* resolved the sentencing issue in *Freeman* but explicitly declined "to reach questions regarding the proper application of *Marks*." *Id.*

[6] These limits of *Marks* are recognized in legal scholarship. See, e.g., Richard Re, *Beyond the Marks Rule*, 132 Harv. L. Rev. 1943, 1982 (2019) ("[I]nstead of finding *Marks* holdings in all, or even most, fractured Supreme Court decisions, the logical subset approach aspires to recognize *Marks* holdings only when one opinion is logically and therefore inescapably 'narrower' than any other."); Lewis A. Kornhauser & Lawrence G. Sager, *The One and the Many: Adjudication in Collegial Courts*, 81 Cal. L. Rev. 1, 46–48 (1993) (*Marks* is available only "where the rationales for the majority outcome are nested, fitting within each other like Russian dolls"); Stearns, *The Case for Including Marks*, 17 Const. Comment. at 328 n.26 (explaining that *Marks* does not apply where "[t]he majority on the Court's judgment [is] composed of two minority camps, each reaching opposite resolutions of the two dispositive issues, but also reaching

The logical subset approach to *Marks* applies here. In *June Medical*, there is one critical sliver of common ground between the plurality and the concurrence: *Whole Woman's Health* was entitled to stare decisis effect on essentially identical facts. 140 S. Ct. at 2120 (plurality); *id.* at 2139 (concurrence). The *Marks* rule therefore applies to that common ground, but it applies *only* to that common ground. That application offers no direct guidance for applying the undue burden standard more generally, let alone to the quite different parental notice requirement in this case. That absence of guidance answers our question: the *Marks* rule tells us that *June Medical* did not overrule *Whole Woman's Health*. That means *Whole Woman's Health* remains precedent binding on lower courts.

D.  *The Swing-Vote Model*

To avoid this result, the State also invokes the second approach to *Marks* and plurality opinions, in which lower courts try to identify the decisive fifth vote on the Supreme Court and treat that vote's reasoning as controlling, even if it represents the views of only one justice. Courts and scholars have called this the "swing-vote" approach. The State argues here that we should adopt the strongest, most controversial version of this swing-vote approach, which "treats as binding *all* aspects of the opinion reflecting the median Justice's views,

the same judgment"); Joseph S. Cacace, Note, *Plurality Decisions in the Supreme Court of the United States: A Reexamination of the Marks Doctrine after Rapanos v. United States*, 41 Suffolk U. L. Rev. 97, 113 (2007) (emphasizing *King*'s "Russian dolls" approach to *Marks*); Linda Novak, Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum. L. Rev. 756, 767 (1980) ("Many of the most troublesome plurality [and concurring] opinions" do not "stand in a 'broader-narrower' relation to each other.").

including propositions that no other participating Justice explicitly or implicitly assented to." Williams, *Questioning Marks*, 69 Stan. L. Rev. at 815; see also Re, *Beyond the Marks Rule*, 132 Harv. L. Rev. at 1979 ("In general, the median opinion would be outvoted whenever at least five Justices in non-median opinions would converge on the same outcome."). The State here argues that we should treat as binding *everything* in the Chief Justice's *June Medical* concurrence, including its continued disagreement with *Whole Woman's Health*, whether that position was essential to the *June Medical* judgment or not, giving that non-majority opinion the power to overrule binding precedent established in a majority opinion.

This swing-vote model is not consistent with Supreme Court precedent or our circuit precedent, nor is it the predominant model in courts around the country. For example, in *United States v. Santos*, 553 U.S. 507 (2008), the Supreme Court split four-one-four on the decisive issue. Justice Scalia wrote a plurality opinion for four justices to affirm; Justice Stevens wrote a separate, narrower opinion concurring in that judgment. But Justice Stevens' concurring opinion expressed views on future cases not before the Court. The plurality addressed how *Marks* should apply. Justice Stevens' reasoning was the narrowest in support of the judgment, but the plurality flatly rejected the idea that everything in Justice Stevens' opinion was binding, in terms directly applicable here: "JUSTICE STEVENS' speculations on that point address a case that is not before him, are the purest of dicta, and form no part of today's holding." *Id.* at 523 (plurality opinion of Scalia, J.).

And whatever strengths the swing-vote model might have in other situations, it is not an appropriate application of

*Marks* in these circumstances: First, the stated disagreement is not essential to the concurrence's bottom-line vote to strike down the Louisiana law. The portions of the concurrence going beyond stare decisis did not support the judgment and are obiter dicta. Second, the dispute between the plurality and concurrence in *June Medical* was not about a new legal issue but about the scope and validity of a Court precedent. Applying the swing-vote test to treat everything in the concurrence as a binding holding would allow less than a majority to overrule a Court precedent that had been established by majority vote.

To frame the issue in simple, logical terms, the *June Medical* plurality adopted two propositions that we can label A and B. Proposition A was that *Whole Woman's Health* previously struck down a nearly identical Texas law, so stare decisis required striking down the new Louisiana law. Proposition B was that the majority opinion in *Whole Woman's Health* correctly stated and applied the undue burden test for abortion regulations. The Chief Justice's concurrence adopted Proposition A, applying stare decisis. It rejected Proposition B, adopting instead Not-B: the majority opinion in *Whole Woman's Health* misstated and misapplied the undue burden test.

Applying *Marks*, the best way to understand the two opinions together is that the plurality's adoption of Proposition B and the concurrence's adoption of Proposition Not-B are both obiter dicta. They were not necessary to the actual judgment striking down the new Louisiana law on stare decisis grounds, Proposition A, for which there were five votes. There was no majority to overrule *Whole Woman's Health*, so that precedent stands as binding on lower courts unless and until a Court majority overrules it.

E. *Other Arguments*

Additional arguments raised here do not fit as neatly into the three principal models for applying *Marks*. The State argues that the Chief Justice's concurrence in *June Medical* should be deemed the narrowest opinion under *Marks* because it would leave more state laws undisturbed. In support of this approach, the State cites *United States v. Johnson*, 467 F.3d 56, 63 (1st Cir. 2006), which recognized that an "alternative" reading of *Marks* might reasonably entail "that the 'narrowest grounds' are simply understood as the 'less far-reaching-common ground.'" For two reasons, we are not persuaded.

First, this approach, too, assumes that the narrower and broader opinions share some common ground in the first place. As the First Circuit observed, "the 'narrowest grounds' approach makes the most sense when two opinions reach the same result in a given case, but one opinion reaches that result for less sweeping reasons than the other." *Id.* In *June Medical*, the plurality and concurring opinions arrived at the same result based on stare decisis. They disagreed on other points. For the reasons explained above, their narrow common ground is subject to *Marks*. But applying the *Marks* rule does not mean that we treat as controlling and precedential portions of the concurrence that were dicta, unnecessary to the fifth vote to strike down the Louisiana law.

Second, comparing the respective ranges of statutes that would survive the two different approaches, taking each approach in its entirety, rather than looking closely for shared reasoning, would be highly disruptive, producing arbitrary results and losing sight of the Court's actual decision. See Stearns, *The Case for Including Marks*, 17 Const. Comment. at

337–38 (the "narrowest grounds" rule does not stand for proposition that opinion that would strike the fewest laws controls). If the *entirety* of the Chief Justice's concurrence were given binding, precedential effect—on the theory that his reasoning would uphold more state laws than Justice Breyer's plurality would—then *June Medical*'s decision *striking down* one Louisiana law would be deemed to have swept away quite a bit of the Court's jurisprudence on the right to choose to terminate a pregnancy. That would be a remarkable result, especially given the Court's silence about such dramatic effects and the lack of a five-vote majority for that overruling. More generally, the State's novel and one-sided interpretation of *Marks* would give one Justice the ability to write obiter dicta that would sweep away constitutional precedents protecting individual rights by adopting broad reasoning that would confine the individual right most narrowly, yet without a majority having actually voted to overrule an earlier precedential opinion.

The State also argues that the Supreme Court itself appears to view all aspects of the Chief Justice's concurrence as controlling, so we should do the same. We do not see evidence that the Court views the entire concurrence as controlling. In fact, Chief Justice Roberts did not view the dicta in his concurrence as binding: "The question today however is not whether *Whole Woman's Health* was right or wrong, but whether to adhere to it in deciding the present case." 140 S. Ct. at 2133. See also *id.* at 2181 (Gorsuch, J., dissenting) ("*Whole Woman's Health* insisted that the substantial obstacle test '*requires* that courts consider the burdens a law imposes on abortion access together with the benefits the law confers.'") (cleaned up), quoting *Whole Woman's Health*, 136 S. Ct. at 2309.

Consistent with its view of the *June Medical* concurrence, the State also argues that we should abandon any consideration of actual benefits of the challenged Indiana notice requirement. Apart from the difficulty in applying *Marks* here, we do not see how having courts close their eyes to genuine and legitimate *benefits* of an abortion regulation makes it *less* likely to survive judicial review. The "undue burden" standard adopted in *Casey* logically implies the existence of a category of "due" burdens. Some regulations might restrict access and/or raise costs, but do so in service of legitimate goals and are on balance justified.

For example, state laws require that only persons with certain medical licenses may perform surgical or medical abortions. Those regulations may restrict access and raise costs. Given the health benefits, there is generally no serious doubt about the constitutionality of such burdens. In *Casey* itself, the Court found that new informed-consent requirements, a waiting period, and some record-keeping requirements would impose genuine burdens but would also serve legitimate purposes. Those burdens were not deemed "undue." See 505 U.S. at 885–87 (mandatory 24-hour waiting period), 900–01 (recordkeeping and reporting requirement); see also *Whole Woman's Health*, 136 S. Ct. at 2309, 2311–12 (*Casey* requires consideration of both burdens and benefits). In this case, it may be that the evidence in a trial on the merits will show a different balance of benefits and burdens. At the preliminary injunction stage, however, the State chose not to offer evidence of benefits that might justify the burdens here. The lopsided evidence of substantial burdens and little or no benefits

convinced the district judge to issue the preliminary injunction and convinced us to affirm that decision.[7]

We recognize that the scope of *June Medical* and the effect of the concurrence has been controversial. The Eighth Circuit and a divided panel of the Sixth Circuit have treated the concurrence as controlling. See *Hopkins v. Jegley*, 968 F.3d 912, 915 (8th Cir. 2020) (per curiam) (combining concurrence and dissenting opinions); *EMW Women's Surgical Center P.S.C. v. Friedlander*, 978 F.3d 418, 437 (6th Cir. 2020); *Little Rock Family Planning Services v. Rutledge*, 984 F.3d 682, 687 n.2 (8th Cir. 2021). Those decisions are not consistent with this circuit's approach to *Marks*. A divided panel of the Fifth Circuit reached

---

[7] We share considerable common ground with our dissenting colleague as we all do our level best to apply the *Marks* rule to *June Medical* in this challenging and fluid area of constitutional law. On the points that divide us at this stage of the case, we offer three observations. First, the dissenting opinion appears to be logically inconsistent, recognizing that *June Medical* did not overrule *Whole Woman's Health*, post at 35, yet seeming to give precedential effect to portions of the Chief Justice's concurrence that disagreed with the *June Medical* plurality's adherence to *Whole Woman's Health*. Post at 31–32. Second, on the record before us, the debate over the role of balancing benefits and burdens of restrictions on abortion simply should not matter in the end. The district court found that the new parental notice requirements would impose a substantial obstacle for the relevant group of pregnant minors, and, at least in the absence of countervailing benefits, that meant the burdens would be undue. 258 F. Supp. 3d at 939-40. On appeal, with the State still declining to offer evidence of genuine benefits, we agreed. 937 F.3d at 978, 981. Unless and until the State tries to offer evidence of benefits, the theoretical debate about the role of balancing should not affect our decision to affirm the preliminary injunction here. Finally, we must note once more that the *June Medical* plurality and concurrence agreed that the new Louisiana law was properly enjoined before it could take effect. 140 S. Ct. at 2114 (plurality) & 2142 (concurrence).

the same conclusion about *June Medical* that we do in *Whole Woman's Health v. Paxton*, 972 F.3d 649, 653 (5th Cir. 2020). At later stages of the same appeal, the panel adhered to that view, 978 F.3d 896, 904 (5th Cir. 2020), and that later opinion was vacated and rehearing en banc was granted, 978 F.3d 974 (5th Cir. 2020). Because a majority of Justices of the Supreme Court has not held otherwise, the balancing test set forth in *Whole Woman's Health* remains binding precedent. That is the precedent we followed in our original decision, and we continue to follow it now, using the approach to *Marks* we have followed before.

We need not repeat more from our original decision. The split decision in *June Medical* did not overrule the precedential effect of *Whole Woman's Health* and *Casey*. As in our original opinion, we have not decided the plaintiff's alternative ground for affirmance, adopted by the district court, that the requirements of *Bellotti v. Baird* apply to parental notice requirements as well as to parental consent requirements. 937 F.3d at 989–90; see also 258 F. Supp. 3d at 945–46. For the reasons explained above and in our original opinion, the district court's preliminary injunction barring enforcement of the new parental notice requirement in Ind. Code § 16-34-2-4(d) and (e) is AFFIRMED.

KANNE, *Circuit Judge*, dissenting. Here we are again, faced with the seemingly endless task of determining whether a law unduly burdens a woman's ability to obtain an abortion. When this case first came to us, the majority of this panel relied heavily on *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), to affirm the district court's pre-enforcement injunction against Indiana's brand-new parental-notification law because Indiana "offered no evidence to support [the law's] proposed benefits," *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 984 (7th Cir. 2019).

In the dissent to the initial opinion, I pointed out that (1) the Supreme Court had held several times that such parental-notification laws are constitutional; (2) Planned Parenthood's evidence did not show that Indiana's parental-notification law places an undue burden on a minor's ability to obtain an abortion; and (3) we should not be in the business of quashing state abortion regulations before they go into force and while their effects, and the reasons for those effects, "are open to debate," *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 693 (7th Cir. 2012).

Thereafter, our full court narrowly denied *en banc* review, with some colleagues expressing hope that doing so would "send this dispute on its way to the only institution" that can say whether Indiana's parental-notification law imposes an undue burden. *Planned Parenthood of Ind. & Ky., Inc. v. Box*, 949 F.3d 997, 999 (7th Cir. 2019) (Easterbrook, J., concurring in denial of rehearing *en banc*). The Supreme Court then granted certiorari—but instead of fulfilling those hopes, it vacated the panel's decision and remanded it "for further consideration in light of" *June Medical Services LLC v. Russo*, 140 S. Ct. 2103 (2020), a fractured case that produced six different opinions.

*Box v. Planned Parenthood of Ind. & Ky., Inc.*, 141 S. Ct. 187, 188 (2020).

So now, with our previous decision in one hand and a half-dozen *June Medical* opinions in the other, we must figure out how the latter affect the former.

The majority says, in essence, that *June Medical* has no effect—that the plurality opinion, along with the Chief Justice's concurrence, simply followed *Whole Woman's Health*, and therefore our original opinion applying its balancing test must have been correct in all respects.

I disagree. The majority gives an expanded reading to the Chief Justice's *June Medical* concurrence, but viewing that narrow concurring opinion—as written, in conjunction with the plurality's opinion—compels a different outcome.

The plurality in *June Medical* held that the Louisiana law at issue was unconstitutional because it "poses a 'substantial obstacle' to women seeking an abortion [and] offers no significant health-related benefits." *June Medical*, 140 S. Ct. at 2132 (plurality opinion). The Chief Justice's concurrence, however, simply held only that the Louisiana law was unconstitutional because, under *Whole Woman's Health*, it "imposed a substantial obstacle." *Id.* at 2139 (Roberts, C.J., concurring).

Thus, the finding of a "substantial obstacle" is the common denominator between the opinions—and we should correct our previous decision by abandoning the added weighing of benefits that Chief Justice Roberts explicitly rejected.

Further, while we cannot presume from the Supreme Court's remand order that our prior decision in this case was wrong, surely *June Medical* had *some* effect on the legal landscape. Else, why didn't the Supreme Court simply deny cert

instead?[1] I do not believe that the Supreme Court is directing us to reassess our prior decision "in light of" a case that sheds no light on the matter whatsoever.

Rather, I do believe that *June Medical* does have a real effect. The Supreme Court knows it, other circuits accept it, and a faithful application of the *Marks* rule requires us to accept it, too.

\* \* \*

This analysis begins with what I think the majority has right, which is quite a bit.

To start, the majority of course identifies the correct basic rule from *Marks*: "When a fragmented court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.)).

Second, the majority correctly warns that "the *Marks* rule is 'more easily stated than applied' and that it has 'baffled and

---

[1] Indeed, this is just one of two cases that the Supreme Court sent back for us to reconsider after *June Medical*. "Sending these cases back …, instead of simply denying review, suggests the High Court rejected a balancing test and expects the Seventh Circuit to apply the more lenient undue-burden framework outlined in the Chief Justice's concurrence." *Whole Woman's Health v. Paxton*, 978 F.3d 896, 920 (5th Cir.), *reh'g en banc granted*, *opinion vacated*, 978 F.3d 974 (5th Cir. 2020) (Willett, J., dissenting).

divided' lower courts." Majority Op. at 8 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003)). That's beyond dispute.

Third, the majority fairly summarizes our cases interpreting the *Marks* rule. For example, "under *Marks,* the positions of those Justices who *dissented* from the judgment are not counted in trying to discern a governing holding from divided opinions," *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 620 (7th Cir. 2014), so we cannot stitch together dissenting and concurring opinions to declare that a new rule of law has been handed down.

And though this next point is not as clear from our case law,[2] I also agree with the majority that we don't generally adopt every word of a "swing vote's" lone concurrence as the binding opinion of the Court; rather, we take only the part of that opinion that serves as "a logical subset of other, broader opinions," *id.* at 619 (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) *(*en banc)), or the "'common denominator' for the judgment," *United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009).

---

[2] For example, two members of this panel, myself included, have applied *Marks* without emphasizing that we follow *only* the part of the concurrence that forms a logical subset of the plurality's reasoning, not necessarily everything the concurrence said. *See United States v. Dixon*, 687 F.3d 356, 359 (7th Cir. 2012) (Hamilton, J.) ("*Marks* is easy to apply here. Even though eight Justices disagreed with Justice Sotomayor's approach and believed it would produce arbitrary and unworkable results, her reasoning provided the narrowest, most case-specific basis for deciding [the case]. Her approach therefore states the controlling law." (citations omitted)); *Schultz v. City of Cumberland*, 228 F.3d 831, 842 n.2 (7th Cir. 2000) (Kanne, J.) ("A divided Court issued four separate opinions …, but under *Marks* …, Justice Souter's concurrence is the controlling opinion on this issue, as the most narrow opinion joining the judgment of the Court.").

Where I part ways with the majority is at the next and ad-
mittedly more difficult question: What part of Chief Justice
Roberts's concurrence in *June Medical* is a "logical subset" of
the plurality opinion or serves as the "common denominator"
to support the judgment?

The majority concludes that in *June Medical*, the "critical
sliver of common ground between the plurality and the con-
currence" is that "*Whole Woman's Health* was entitled to *stare
decisis* effect on essentially identical facts." Majority Op. at 16.
But that conclusion ignores the substance of Chief Justice Rob-
erts's position. In fact, the majority disregards the Chief Jus-
tice's words entirely, save for one quote in the final pages. If
the *Marks* rule demands one thing, it's that we (to paraphrase
Justice Frankfurter) read the opinions, read the opinions, read
the opinions, to discern a common denominator of the Court's
reasoning. Henry J. Friendly, Benchmarks 202 (1967). And
once we read the opinions, it becomes clear that the Chief Jus-
tice concurred on a much narrower and more specific ground
than the majority determines.

The Chief Justice began his concurrence by reiterating his
continued belief that *Whole Woman's Health* "was wrongly de-
cided." *June Medical*, 140 S. Ct. at 2133 (Roberts, C.J., concur-
ring). "The question" in *June Medical*, however, was "not
whether *Whole Woman's Health* was right or wrong, but
whether to adhere to it in deciding the present case." *Id.*

That led to a discussion of *stare decisis* principles. Among
other things, Chief Justice Roberts stressed that "[*s*]*tare decisis*
principles … determine how we handle a decision that itself
departed from the cases that came before it. In those instances,
'[r]emaining true to an "intrinsically sounder" doctrine estab-
lished in prior cases better serves the values of *stare decisis*

than would following' the recent departure." *Id.* at 2134 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 231 (1995) (plurality opinion)).

Chief Justice Roberts then turned to *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which established the undue burden standard that both parties agreed "provide[d] the appropriate framework to analyze Louisiana's law." *June Medical*, 140 S. Ct. at 2135 (Roberts, C.J., concurring). As the Chief Justice put it: "Under *Casey*, … '[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.' Laws that do not pose a substantial obstacle to abortion access are permissible, so long as they are 'reasonably related' to a legitimate state interest." *Id.* (citation omitted) (quoting *Casey*, 505 U.S. at 877, 878).

Then, the Chief Justice observed that in *Whole Woman's Health*, the Court "faithfully recit[ed] this standard" from *Casey* but "added the following observation: 'The rule announced in *Casey* … requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer.'" *Id.* (quoting *Whole Woman's Health*, 136 S. Ct. at 2309). That suggestion was repeated by the *June Medical* plurality. *Id.* And "[r]ead in isolation from *Casey*," that suggestion "could invite a grand 'balancing test in which unweighted factors mysteriously are weighed.' Under such tests, 'equality of treatment is … impossible to achieve; predictability is destroyed; judicial arbitrariness is facilitated; judicial courage is impaired.'" *Id.* at 2135–36 (citations omitted) (first quoting *Marrs v. Motorola, Inc.*, 577 F.3d 783, 788 (7th Cir.

2009); and then quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1182 (1989)).

But according to Chief Justice Roberts, "[n]othing about *Casey* suggested that a weighing of costs and benefits of an abortion regulation was a job for the courts." *Id.* at 2136. "*Casey* instead focuses on the existence of a substantial obstacle … ." *Id.* So, because "[w]e should respect the statement in *Whole Woman's Health* that it was applying the undue burden standard of *Casey*," *id.* at 2138, "*Casey*'s requirement of finding a substantial obstacle before invalidating an abortion regulation [was] a sufficient basis for the decision … in *Whole Woman's Health*" and thus too for the decision in *June Medical*, *id.* at 2139. "In neither case, nor in *Casey* itself, was there call for consideration of a regulation's benefits, and nothing in *Casey* commands such consideration." *Id.*

Finally, the Chief Justice came to his ultimate conclusion:

> Under principles of *stare decisis*, I agree with the plurality that the determination in *Whole Woman's Health* that Texas's law imposed a substantial obstacle requires the same determination about Louisiana's law. Under those same principles, I would adhere to the holding of *Casey*, requiring a substantial obstacle before striking down an abortion regulation.

*Id.*

And *that* is the critical sliver of common ground between the plurality and the concurrence: *Casey*'s requirement of "a substantial obstacle before striking down an abortion regulation," and the Court's prior determination that "Texas's law imposed a substantial obstacle," compelled "the same determination about Louisiana's law." *Id.*

Therefore, the majority's formulation of the common ground ("*Whole Woman's Health* was entitled to *stare decisis* effect on essentially identical facts"), while true in some opaque sense, is imprecise.

Nowhere does the Chief Justice suggest that *Whole Woman's Health*'s formulation of a balancing test is entitled to *stare decisis* effect—only its requirement of a substantial obstacle is. In fact, he quite clearly warns us of a sinister "grand 'balancing test'" that departs from *Casey*, *id.* at 2135 (quoting *Marrs*, 577 F.3d at 788), and reminds us that when a decision "depart[s] from the cases that came before it, … '[r]emaining true to an "intrinsically sounder" doctrine established in prior cases better serves the values of *stare decisis* than would following' the recent departure," *id.* at 2134 (quoting *Adarand Constructors*, 515 U.S. at 231).

Translation: Where *Whole Woman's Health* paid lip service to *Casey* but then strayed from it by weighing benefits, it is better to remain true to *Casey*'s established substantial-obstacle analysis than to follow the errant departure from it. So courts should continue to apply the substantial-obstacle test from *Casey*.

The majority objects to reading this much into Chief Justice Roberts's opinion because "[t]he portions of the concurrence going beyond *stare decisis* did not support the judgment and are obiter dicta." Majority Op. at 18. But "[a] dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding." *Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986), *abrogated on other grounds by Hart v. Schering–Plough Corp.*, 253 F.3d 272 (7th Cir. 2001). The Chief Justice's discussion of *Whole Woman's Health* and its flawed balancing

test plainly formed the "analytical foundation" for his conclusion that only *Whole Woman's Health*'s finding of a substantial obstacle was to be given *stare decisis* effect.

At any rate, the Chief Justice's *stare decisis* discussion alone supports that conclusion. And even if *everything* but the Chief Justice's bottom-line conclusion were disregarded as dicta, still we are left with the same unavoidable outcome: "Under principles of *stare decisis*, I agree with the plurality that the determination in *Whole Woman's Health* that Texas's law *imposed a substantial obstacle* requires the same determination about Louisiana's law," and "I would [also] adhere to the holding of *Casey*, requiring a *substantial obstacle* before striking down an abortion regulation." *June Medical*, 140 S. Ct. at 2139 (Roberts, C.J., concurring) (emphases added).

The majority's abridged version of this bottom line— "*Whole Woman's Health* was entitled to *stare decisis* effect on essentially identical facts"—seems a simply abstract statement of law, not the Chief Justice's ultimate conclusion supporting the judgment.

The majority also objects that following the Chief Justice's approach would "overrule" *Whole Woman's Health*. However, the majority also acknowledges that "[t]he question" in *June Medical* was "not whether *Whole Woman's Health* was right or wrong, but whether to adhere to it in deciding the present case." *Id.* at 2133. So if the Chief Justice did not overrule *Whole Woman's Health* by "respect[ing]" its statement that it was following *Casey*, *id.* at 2138, refusing to read it "in isolation from *Casey*," *id.* at 2135, and giving *stare decisis* effect to only the substantial-obstacle finding necessary to its judgment, *id.* at 2138, it is difficult to see how we would overrule *Whole Woman's Health* by doing the same.

My position also is not groundbreaking. The two other circuits that have conclusively resolved this issue came to the same outcome. *Hopkins v. Jegley*, 968 F.3d 912, 915 (8th Cir. 2020) (per curiam); *EMW Women's Surgical Ctr. P.S.C. v. Friedlander*, 978 F.3d 418, 437 (6th Cir. 2020); *Little Rock Family Planning Servs. v. Rutledge*, 984 F.3d 682, 687 n.2 (8th Cir. 2021).

The majority disregards these cases as "not consistent with this circuit's approach to *Marks*." Majority Op. at 22. There are some differences in our approaches, to be sure. The Eighth Circuit, for example, declared that Chief Justice Roberts's "separate opinion is controlling" because he was the swing vote. *Hopkins*, 968 F.3d at 915. That's a bit oversimplistic for our precedent requiring us to adopt only that portion of the concurring opinion that forms a "logical subset" of the plurality's reasoning. And the Sixth Circuit concluded that the Chief Justice's concurrence provides the governing standard "[b]ecause all laws invalid under the Chief Justice's rationale are invalid under the plurality's, but not all laws invalid under the plurality's rationale are invalid under the Chief Justice's." *Friedlander*, 978 F.3d at 433. We have not adopted that sort of reasoning.

But even if we cannot rely on their approaches under *Marks*, that those courts reached the same conclusion while applying different standards even between themselves is stronger evidence that their outcome is correct than that it is wrong. And in my view, our own standards governing the application of the *Marks* rule force the same result reached by those circuits. That really should come as no surprise given that, at bottom, each circuit is trying its level best to apply the same guidance from *Marks* to the same set of opinions in *June Medical*, varying circuit precedents notwithstanding.

There is also a speck of precedent from the Fifth Circuit that the majority suggests lends it support. That's a generous suggestion. The Fifth Circuit first addressed this issue when it considered Texas's motion to stay an injunction against the enforcement of its statute requiring women to undergo certain medical procedures before receiving "dilation and evacuation" abortions. *Whole Woman's Health v. Paxton*, 972 F.3d 649 (5th Cir. 2020). The panel majority denied the motion as "procedurally improper," *id.* at 652, but apart from that, it also devoted a few words to rejecting Judge Willett's dissenting view that the district court's injunction rested upon an invalid balancing test, *id.* at 654 (Willett, J., dissenting). The majority concluded that *Whole Woman's Health*'s "formulation of the [balancing] test continues to govern this case." *Id.* at 653 (majority opinion).

Two months later, the same panel again addressed the *Marks* issue and held to its prior conclusion over a lengthy dissent from Judge Willett. *Whole Woman's Health v. Paxton*, 978 F.3d 896 (5th Cir. 2020). But *en banc* review has since been granted, and the panel's second decision has been vacated. *Whole Woman's Health v. Paxton*, 978 F.3d 974, 975 (5th Cir. 2020). Its earlier discussion, while technically still on the books, is clearly in limbo, too.

What's more, even if the Fifth Circuit panel agreed with the majority's *outcome*, its analysis conflicts with the majority's approach here. The majority here says that "[t]he logical subset approach to *Marks* applies" and that there is a "sliver of common ground between the plurality and the concurrence." Majority Op. at 16. But the Fifth Circuit panel held that Chief Justice Roberts's "concurrence cannot 'be viewed as a logical subset of the' plurality's opinion" or "logically

compatible" with it. *Paxton*, 978 F.3d at 904 (quoting *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013)).

Which is to say, no other court has adopted the majority's reasoning. The majority has scant support from our sister circuits, and it might soon have none.

*    *    *

To summarize, *June Medical* is not nugatory, but neither does it overrule *Whole Woman's Health*. It simply demands that courts continue to apply *Casey*'s substantial-obstacle test, which survives both *Whole Woman's Health* and *June Medical* by operation of the *Marks* rule. The majority in this case erred, therefore, by weighing the benefits conferred by Indiana's law against its burdens. This is just the sort of "grand balancing test" that the Chief Justice disclaimed, and it goes far beyond the narrowest common ground supporting the judgment in *June Medical*. It thus has no place in our analysis, and the majority should have corrected its error on remand by returning to the settled substantial-obstacle test from *Casey*.

The majority's error is even more disconcerting considering the procedural posture and "limited factual record" in this case. *Adams*, 937 F.3d at 988. The record is limited, of course, because the court enjoined enforcement of the law before it went into effect. The obvious question is, how is a state *ever* supposed to overcome the majority's "grand balancing test" when a court can stamp out its abortion regulations before they even get off the ground? Are we to expect the state to reach into some alternate reality, where its popularly enacted laws were let alone, and pluck evidence of their benefits from there? *See id.* at 997 (Kanne, J., dissenting) ("Generalized information about abortion regulation writ large cannot

substitute for specific, tailored data regarding the statute at issue."). If "weighing [the] costs and benefits of an abortion regulation" has really become "a job for the courts," *June Medical*, 140 S. Ct. at 2136 (Roberts, C.J., concurring), then surely it must be "an abuse of discretion for a district judge to issue a pre-enforcement injunction while the effects of the law (and reasons for those effects) are open to debate," *A Woman's Choice*, 305 F.3d at 693.

The other reasons for my prior dissent remain unchanged. The Supreme Court has confirmed that parental-notification requirements are constitutional time and again. And Planned Parenthood has failed to show that requiring mature minors to notify their parents that they intend to have an abortion (where a judge has found that avoiding notification is not in their best interests) constitutes an undue burden under *Casey*. This court should reverse the district court's injunction and let Indiana exercise its legislative judgment that a parental-notification law best serves the interests of its citizens.

I respectfully dissent.